KATHRYN H. TRAUTZ v. LILLIAN H. LEMP ET AL., Appellants.

KATHRYN H. TRAUTZ v. C. A. TILLES ET AL.; ALEXANDER H. HANDLAN ET AL., Appellants.

KATHRYN H. TRAUTZ v. KATHRYN MARIE HANDLAN TRAUTZ, Appellants.

KATHRYN H. TRAUTZ v. MATHUDY TIRE & RUBBER COMPANY, Appellant.

KATHRYN H. TRAUTZ v. EUGENE W. HANDLAN ET AL., Appellants.— 46 S. W. (2d) 135.

Court en Banc, February 6, 1932.

582

584

*Edward C. Crow* and *Jones, Hocker, Sullivan & Angert* for Lillian H. Lemp.

*Wilfley, Williams, McIntyre & Nelson* for C. A. Tilles and National Bank of Commerce.

*Robert A. Roessell* for Kathryn Marie Handlan Trautz.

*Taylor, Chasnoff & Willson* for Edward R. and Alexander H. Handlan, Individually and as Trustees and Executors of Estate of Alexander H. Handlan.

*Meredith & Harwood* for respondents.

*McDonald & Just* for appellants National Bank of Commerce in St. Louis and C. A. Tilles, Administrators *Pendente Lite* of the Estate of Mollie A. Handlan.

*Irwin V. Barth* for respondent Kathryn H. Trautz.

FRANK, J.—The several appeals herein were consolidated and presented as one cause and will be decided in one opinion. These appeals involve the construction of the will of Alexander H. Handlan, deceased, and certain other questions, the determination of which hinges, in the main, upon the proper construction of the will.

The testator made certain specific bequests which are not in question here, then disposed of the residue of his estate by the fourteenth clause of his will which reads as follows:

"All the rest, residue and remainder of my estate, of whatsoever kind and wherever situated, real, personal or mixed, I devise and bequeath unto my son Eugene W. Handlan and my son Alexander H. Handlan, Jr., and my son E. R. Handlan, in trust, however, upon the following uses, trusts and conditions, that is to say: (a) This

trust is to commence immediately upon the termination of the administration of my estate, which must be accomplished within the statutory period, unless for good and sufficient reasons determined by the probate court having jurisdiction over the administration of said estate, it becomes impossible or impracticable to close the administration within such statutory period. This trust is to continue for a period of twenty (20) years from its beginning. . . .''

Contention is made that under the terms of the trust there was a period of lapse between the time of testator's death and the vesting of the legal title in the trustees, the necessary effect of which was to transgress the rule against perpetuities.

The rule against perpetuities prohibits the granting of an estate which will not necessarily vest within a time limited by a life or lives then in being and twenty-one years thereafter together with the period of gestation necessary to cover cases of posthumous birth. [Koehler v. Rowland, 275 Mo. 573, 586, 205 S. W. 217; Shepperd v. Fisher, 206 Mo. 208, 238, 103 S. W. 989.] This rule is easily understood, but it is often difficult to determine whether or not the facts of a given case bring it within the rule.

The residuary clause of the will devised and bequeathed the residue of testator's property to his three sons in trust for the purpose named in the will, and provided that the trust was to commence immediately upon the termination of the administration of his estate in the probate court. The contention is that the legal title to the property devised by this clause of the will does not vest in the trustees until the trust commences, and, if the trust does not commence until the administration ends, it is impossible to determine when the legal title to the property will vest in the trustees, because the time when the administration of the estate will terminate is problematical. From this it is argued that it is impossible to determine whether or not the legal title will necessarily vest in the trustees within the time fixed in the rule against perpetuities and for that reason the attempted devise violates the rule.

The words *devise* and *bequeath*, used by the testator in leaving the residue of his property to his three sons in trust, are not words of futurity, but on the contrary they import a present vesting of the legal title in the trustees immediately upon the death of the testator. There is no language in the will evincing a contrary intent unless it be the provision that the trust is to commence immediately upon the termination of the administration of the estate in the probate court. The contention is that the legal title cannot vest in the trustees until the trust commences, and as the will provides that the trust shall commence when the administration ends, necessarily the legal title will vest in the trustees at that time. This contention cannot be upheld for two rea-

sons, (1) it is opposed to the rules of law governing the creation of trusts, and (2) it is contrary to the intention of the testator as expressed in his will.

The law relative to trusts provides "that a trust must arise at the time it is attempted to be created, instead of being brought forth by subsequent and independent circumstances." [39 Cyc. 43, par. f.] In the case of Sell v. West, 125 Mo. 621, 28 S. W. 969, this court said: "The relation of trustee and *cestui que trust*, must arise at the time of the original transaction and be contemporaneous therewith, and cannot be brought forth by subsequent and independent circumstances." In order to create a valid express trust, it is necessary that some estate or interest be conveyed to the trustee, and when the instrument creating the trust is other than a will, that estate or interest must pass immediately. [Nichols v. Emery, 109 Cal. 323, 330; Lewis v. Curnutt, 130 Iowa, 423, 429.] In other words, an express trust arises on the effective date of the instrument creating it. No valid reason can be advanced why a different rule should be applied where the instrument creating the trust is a will. So far as concerns the creation of an express trust, the characteristic distinction between a will and a deed is, that the will becomes operative on the death of the testator, while the deed becomes effective immediately upon its execution and delivery. The same law which requires a deed to convey the legal title to the trustee on its effective date, in order to create a valid trust, requires a will to do the same thing.

We must also keep in mind the rule of construction that the intent of the testator as gathered from the four corners of the will must control unless it contravenes some established rule of law. It has been well said: "Whether the trust be created by will or by deed, if it be lawful, and the intent can be fairly ascertained from the examination of the instrument, the courts will uphold and enforce it. To that end they will not be restrained by narrow and technical rules of construction; but if the intent of the grantor or donor be apparent, even though not expressed with technical nicety, the trust will not be avoided. The intent of the settler in the creation of the trust is what the court looks to, and not to any particular form of words; and that is to be carried into effect unless it contravenes some public policy of the law."

Another well settled rule is that where a will is open to two constructions, one which would violate the rule against perpetuities, and the other not, the latter will be adopted and the will upheld if it is valid in other respects. [Perry on Trusts (6 Ed.) sec. 381.]

Viewing the will in the light of what we have heretofore said, we are first met with established rules of law which forces the con-

clusion that the trust was created, if at all, on the effective date of the will, and not at the termination of the administration of the estate. The testator knew such would be the fact because he is presumed to have known the law. It cannot be, and in fact is not disputed, that the testator intended to leave the property in question in trust to his three sons for the purposes named in the will. Neither can it be successfully contended that the language of the will, "*I devise and bequeath* unto my said sons [naming them] in trust, etc." if standing alone, would not vest the legal title to the property devised in the trustees, immediately upon the effective date of the will, because the words *devise* and *bequeath* are not words of futurity, but import an immediate vesting of title. This being true, the question necessarily turns on what the testator meant when he said, "This trust is to commence immediately upon the termination of the administration of my estate."

The words, "devise and bequeath unto my sons in trust, etc.," are amply sufficient to create an express trust, and we should not construe subsequent language in the will as destroying that trust unless such language is not open to any other reasonable construction. As heretofore stated, the testator could not lawfully provide in his will that a trust should be born on the date of the termination of the administration of the estate. But if such an intention appears from a fair consideration of the will, we should say so and hold that his attempt to create a trust in that manner was futile. But we do not so construe the will. The testator first created an express trust by using apt words for that purpose, and when he later said, "This trust is to commence immediately upon the termination of the administration of my estate," he was evidently not referring to the time when the legal title to the trust property would vest in the trustees, but rather to the commencement of the active operation of that part of the trust which would necessarily be postponed by the administration of the estate. The testator is presumed to have known the law governing wills, and is presumed to have prepared his will in the light of that law. He knew that the executors would have no authority to manage, lease or otherwise control the real estate unless he so directed in his will. The will gives the executors no such authority, but on the contrary it gives the trustees broad powers in that respect. The testator also knew that the personal property belonging to his estate would pass through administration in the probate court, during which time the trustees would not have possession or control of such property. Considering all provisions of the will, we are convinced that the testator intended that the active operation of the trust should begin on the effective date of the will, except as it would be interrupted or postponed by the administration of the estate, and when he used the words "this trust is to commence

immediately upon the termination of the administration of my estate," he evidently meant that the active operation of the trust as to that part of the property which would necessarily be in the possession of the executors during probate administration, would commence upon the termination of the administration. To hold that the trust does not commence until the termination of the administration would render the trust void, because such a holding would be contrary to the law which provides that a trust comes into existence on the effective date of the instrument creating it.

The language of the will reasonably justifies the construction we have given it, and by giving it that construction the intent of the testator will be carried out, a thing which should be done in every case where such intent can be gleaned from the will, and that intent does not transgress some public policy of the law. A strikingly similar question was before the Supreme Court of Iowa in Lewis v. Curnutt, 130 Iowa, 423. There one Julia E. Crockett by warranty deed conveyed certain lands to one Curnett as trustee, for the expressed consideration of "one dollar and the execution of the trust hereby created." At the same time as a part of the same transaction the grantor made and delivered to Curnett another written instrument in which it was recited that Curnett was appointed as trustee *to take and hold the title* to said real estate for grantor, and *from and after grantor's death and not before,* said trustee was to handle and dispose of the property as directed in said trust instrument. It was there contended that the words, *from and after grantor's death and not before,* operated to limit and modify the authority given in the earlier part of the same instrument *to take and hold title to the property,* the effect of which was to destroy the title granted to the trustee by the deed. Of that contention, the court said:

"It is said that the words 'from and after my death and not before,' which are found in the writing, limit and modify the authority given in the earlier part of the same instrument 'to take and hold title' to the property. In other words, according to this theory, while the deed, standing alone, would be sufficient to pass a present title and interest, the terms of the accompanying writing are inconsistent with such a purpose, and the repugnance thus arising operates to neutralize and destroy the grant. As we shall hereinafter note, if any such repugnancy be found, it could not have the effect claimed for it; but we think it does not exist. Upon a fair construction of the writings as a whole, the words 'from and after my death' have no reference to the time when the title or interest shall pass under the deed, but to the time when the trustee shall have authority to take possession and proceed with the active performance of his trust."

For the reasons heretofore stated, we hold that the trust was created and the legal title to the trust property passed to the trustees on the effective date of the will.

Contention is made that regardless of the time of the vesting of the legal title in the trustees, the suspended vesting of the absolute title to the equitable estate constitutes a violation of the rule against perpetuities.

The basis of this contention is the claim that title does not vest in the ultimate beneficiaries of the trust until the end of the trust period. Boiled down, this contention is bottomed on two propositions, (1) that it is impossible to tell when the trust period will end, and (2) by providing in the will that in the event of the death of any of his children the trust should be administered in favor of and for the benefit of their lineal descendants *per stirpes* and not *per capita*, testator contemplated an indefinite failure of issue. The argument is that the trust does not commence until the administration ends, and as it is impossible to determine when the administration will end, it is likewise impossible to determine when the trust will commence, thereby making it possible for the twenty-year period of the trust to extend far enough into the future that testator's lineal descendants (possibly great grandchildren or even more remote progeny) might become beneficiaries under the will, thus making it possible for an unborn child of an unborn child to become the recipient of testator's bounty.

A sufficient answer to the first proposition is that in the early part of this opinion, for reasons there stated, we held that the trust began on the date of testator's death, the effective date of the will, and continued for a period of twenty years thereafter. An answer to the second proposition involves the determination of whether or not testator's use of the words *lineal descendants* contemplated an indefinite failure of issue. The words *lineal descendants* may or may not include grandchildren, great grandchildren and more remote progeny, depending upon the sense in which they are used. If a testator says what he means by the use of such words, or if what he intended by their use appears from a fair construction of the will, his intention should govern. As we read the will, testator said what he meant by the use of the words, *lineal descendants*. Testator's own children and his granddaughter, Kathryn Handlan, were the named beneficiaries of the trust. The will makes the following provision in the event of the granddaughter's death during the trust period: ''In event of the death of my said granddaughter, Kathryn Handlan, within the period of this trust, her said share herein shall cease and terminate and the same be administered in favor of and for the benefit of the remaining beneficiaries, to-wit: *My children or their children.*'' (Italics ours.) If the will had stopped with the provision that the granddaughter's share, in case of her death during the trust period, should go to the remaining beneficiaries, that provision, standing alone, might raise the

question as to who the *remaining beneficiaries* would be, but the testator goes one step further and says who the remaining beneficiaries shall be, to-wit: "My children or their children." The words "my children" refer to testator's own children if living, and the words "their children" do not include any person other than the immediate descendants in the first degree of testator's own children. [Grenzebach v. Franke, 315 Mo. 392, 399, 286 S. W. 79.]

The will contains this further provision:

"And I direct that in event of the death of any of my other children herein named, the trust shall be administered in favor of and for the benefit of their lineal descendants, *per stirpes* and not *per capita,* and in event of any one or more dying without children i. e., lineal descendants, said trust is to be administered for the benefit of the remaining beneficiaries of the trust as hereinafter set out."

If the testator had stopped in this clause of the will, with the provision that in event of the death of any of his children therein named, the trust should be administered in favor of his lineal descendants, such a provision, standing alone, might raise a question as to who the lineal descendants would be. But in the very next sentence the language there used by the testator indicates what he meant by the words "lineal descendants." He says that in event of any one or more dying without "children, that is, lineal descendants, etc." This latter provision clearly indicates that he used the word "children" and the words "lineal descendants" interchangeably.

Another provision of the will indicates that the testator did not intend that his bequests should extend farther than his own children's legitimate offsprings of the first degree. That provision reads as follows:

"I direct that at the end of twenty (20) years from the beginning of this trust, the aforesaid trustees shall distribute the assets, in whatever form these assets may be, in the proportion and manner hereinabove mentioned, to the beneficiaries of this trust, or, except where otherwise mentioned, to *their child or children* as above referred to, or in the event any one dies *not survived by a child or children,* then that portion which his or her *child or children* would have taken shall revert to the remaining beneficiaries of this trust." (Italics ours.)

Contention is made that the words, "or in the event any one dies not survived by a child or children" is not limited to the death of testator's own children, but comprehends his grandchildren, great grandchildren or any one within the line of his progeny. The will is not open to such a construction, unless by use of the word "children" testator intended to include grandchildren, great grandchildren and any one within the line of his progeny. Viewing the will

as a whole, it convinces us that by the use of the word "children" the testator meant the immediate descendants in the first degree of the person named as ancestor. In reaching this conclusion, we are not unmindful of the rule that the word "children" may and should be construed to include grandchildren, great grandchildren, etc., where the provisions of the will indicate that such was the intention of the testator, or where such a construction is necessary to carry out the testator's intent. The rule is tersely stated in 40 Cyc., p. 1448, sec. 2, as follows:

"The word 'children,' as used in a will, is usually given its primary meaning of legitimate offspring of the first degree, and does not include more remote descendants, unless there is something in the context of the will which manifests an intention on the part of the testator, to give it a more extensive meaning. Ordinarily it will not include 'heirs,' heirs of the body, grandnieces or grandnephews, or a husband of a deceased child; but where such is the manifest intention of the testator it may be construed to mean issue or descendants. 'Children' will not be interpreted to include grandchildren, or great grandchildren unless it clearly appears that the testator meant to include grandchildren or great grandchildren."

As heretofore stated, the primary and ordinary meaning of the word "children" is the immediate descendants in the first degree of the person named as ancestor. The will does not indicate that the testator intended to use the word in any other sense.

The sixteenth clause of the will seeks to penalize any child or grandchild who attempts to contest or change the will, by providing that the share which such contesting beneficiary otherwise would have received should revert and pass to the non-contesting beneficiaries, just as though such (contesting) child or children, grandchild or grandchildren died prior to the termination of the trust provided by said will, without being survived by any child or children, as provided for by clause fourteen of the will. It is contended that this clause of the will characterizes the purpose of the testator to provide not only for children and grandchildren but likewise any child or grandchild of any thereof, thus extending his bounties to an unborn child of an unborn child. This clause of the will is not open to the construction contended for, but as no reason is advanced in support of the contention made, we will not pursue it further, except to call attention to the provision that the share which a contesting beneficiary would otherwise have taken *"shall revert to my children or grandchildren."* This provision clearly shows that testator intended his bequests to stop with his grandchildren.

Further contention is made that this clause of the will necessarily postpones the vesting of title in the beneficiaries until the end of the trust period.

The theory advanced in support of this contention is that if the non-contesting beneficiaries take the share of the beneficiaries who attempt to contest the will, with no restrictions as to the time when an attempted contest will forfeit the contestants' share, it will be impossible to determine who will be the non-contesting beneficiaries until the end of the trust period, and likewise impossible to determine what beneficiaries will be eligible to take the property, until that time. The trouble with this contention is, the fact that a beneficiary who takes under the will must refrain from an attempted contest of the will, is not a condition precedent to the vesting of title in such beneficiary. On the contrary, an attempted contest of the will is a condition subsequent, upon the happening of which the title theretofore vested in such contestant is divested and reverts to the remaining beneficiaries. "The law favors vested estates, and the rule is that estates shall be held to vest at the earliest possible period unless a contrary intention is clearly manifested in the grant. . . . An estate is vested when there is an immediate right of present enjoyment, or a present fixed right to future enjoyment." [Tindall v. Tindall, 167 Mo. 218, 225, 66 S. W. 1092.] Considering all provisions of the will in the light of this rule, we hold that each named beneficiary of the trust, upon the death of testator, took a vested but defeasible beneficial interest, that is, a defeasible fee in the trust estate, subject to be defeated by his or her death before the end of the trust period. In event of such death, the absolute fee simple title to such deceased beneficiary's interest will vest in the surviving child or children, if any, of such deceased beneficiary, but in event there be no surviving child or children, the title to such interest will pass to and vest in fee in the surviving beneficiaries of the trust (except in the cases of Lillian Handlan Lemp and Kathryn Marie Trautz) concerning which the will makes different provisions. [Deacon v. Trust Co., 271 Mo. 669, 695, 197 S. W. 261.]

The rule against perpetuities has reference to the time within which the title vests, and has nothing to do with the postponement of the enjoyment. A vested interest does not necessarily include a right to the possession, and if an interest is vested it is not subject to the rule, however remote may be the time when it may come into possession. [21 R. C. L. 29, sec. 12; Schee v. Boone, 295 Mo. 212, 225, 243 S. W. 882.] As both the legal title and the equitable beneficial interest in and to the trust property vested immediately upon the testator's death, the former in the trustees and the latter in the beneficiaries, the rule against perpetuities has no application. A vested interest is not subject to the rule. [Gray on Rule Against Perpetuities (3 Ed.) sec. 205; Deacon v. Trust Co., 271 Mo. 669, 695, 197 S. W. 261.]

Further contention is made that the trust created by the will was a dry trust which the Statute of Uses executed on the effective date of the will, the result of which was to immediately vest the complete title, both legal and equitable, in the beneficiaries of the trust.

A dry trust is one which requires the performance of no duties by the trustees to carry out the trust, but by force of which the mere legal title rests in the trustee. It is settled law that where property is bequeathed to one in trust for the use and benefit of another, with no active duties for the trustee to perform, a dry trust is created, no interest passes to the trustee, and by opreation of the Statute of Uses the trust is executed on the effective date of the instrument creating it.

In this case, the will provides many duties to be performed by the trustee in relation to the trust property which consists of both real and personal property. No claim is made that the will does not provide for the performance of these duties by the trustees. The contention is that the will postpones the performance of such duties until the termination of the administration of the estate in probate court. Based on this contention, argument is made that as the trustees would have no active duties to perform for the indefinite period of time between the effective date of the will and the termination of the administration of the estate, the trust created by the will was a dry trust which the Statute of Uses executed.

We do not agree with this contention for two reasons, (1) the trustees had active duties to perform in connection with the real estate from the effective date of the will, and (2) the postponement of the performance of the duties of the trustees until the termination of the administration would not render an otherwise active trust dry.

The thing which identifies a trust as an active trust, is the provision in the trust instrument that directs the performance of active duties by the trustee. The time when the active performance of such duties begins is immaterial to a determination of the character of the trust. Although a trust instrument makes the actual performance of the trustee's duties contingent upon the occurence of an event which may or may not occur, the trust is nevertheless an active one, provided the instrument creating it invests the trustee with authority to perform active duties and directs the performance of such duties in case such event does occur. Such a situation was presented to the Supreme Court of South Carolina in the case of Bank v. Garlington, 54 S. C. 413. There a testator bequeathed certain lands to his executors in trust for the use and benefit of his son for life, with right of possession and enjoyment in the son during his life, unless efforts were made to subject the land to the payment of the son's debts, in which event the executors were directed to take charge of

the property and protect the same from such debts. It does not appear in that case that the trustees would ever have any active duties to perform unless efforts were made to subject the land to the payment of the son's debts, an event which might or might not happen. In holding that the Statutes of Uses did not execute such a trust, that court said:

"It will be observed that Spring Grove is not devised to John G. Williams, directly, for his life, but to the executors, 'for his use and benefit during his life'—and if this were all, there would be no doubt that the Statute of Uses would execute the use, and the legal title would pass to John G. Williams for his life. But this is not all; for the testator proceeds to say that the property is 'to remain in his possession and enjoyment, unless efforts be made to subject the same to the payment of his debts and liabilities; and in this event, to be taken charge of by my executors to prevent and protect the same from such liabilities.' This rendered it absolutely necessary that the legal title should remain in the executors, in order that they might be enabled to carry out this provision of the will. For if the legal title passed into John G. Williams by virtue of the Statute of Uses, it would be impossible for the executors to take charge of the property and protect it from the claims of the creditors of John G. Williams. See Heath v. Bishop, 4 Rich. Eq. 46."

The same thing may be said in the case at bar. If the performance of all the active duties of the trustees was postponed until the termination of the administration of the estate, still the trust would be an active trust. There is no question but what the will invests the trustees with authority to perform active duties. Under the assumption that the actual performance of such duties does not commence until the administration ends, it would still be necessary for the trustees to hold the legal title to the property, otherwise they would have no authority to take charge of the property and enter upon the performance of their active duties at that time. This conclusion prevents the operation of the Statute of Uses.

Contention is made that the indeterminate period preceding the termination of the trust will result in an unlawful restrain upon alienation of the trust property.

The will gives both the executors and the trustees unlimited power to sell and convey all of the trust property. Where the trustees have power to sell the trust property within the time limited by the rule against perpetuities, there is no unlawful restraint on alienation. [21 R. C. L. 336.] There are other reasons why the will does not amount to an unlawful restraint on alienation of the trust property, but as the reason mentioned necessarily determines the question, we will not discuss other reasons.

The final assault on the validity of the trust is that the will provides for an unlawful accumulation of income on the trust property.

We have heretofore determined that the title to the trust property vested on the date of testator's death—the legal title in the trustees and the equitable beneficial interest in the beneficiaries of the trust. The rule against perpetuities limiting the period for which accumulations may be directed to continue has no application, where, as in this case, the title to the property out of which the income arises is vested. [48 C. J. 989, 990.]

From what we have heretofore said, it results that the trial court erred, (a) in adjudging that the trust created by the will was violative of the rule against perpetuities, (b) in adjudging that testator dies intestate as to the property devised by the residuary clause of his will, and (c) in adjudging partition of such property among testator's heirs-at-law.

The next question presented is whether or not testator, during his lifetime, made valid gifts of the 1550 shares of stock in the Handlan-Buck Manufacturing Company, to his three sons. If the alleged gifts were valid gifts *inter vivos,* then such stock is not a part of testator's estate. On the contrary, if the alleged gifts were not valid gifts *inter vivos,* then such*stock belongs to testator's estate and was a part of the trust property disposed of by the residuary clause of the will.

On September 11, 1916, testator and his wife celebrated their golden wedding anniversary. On this occasion testator gave to each of his seven children 100 shares of stock in the Handlan-Buck Manufacturing Company. Testator owned 2250 shares of the capital stock of said corporation, and after making this gift of 700 shares to his children it left him 1550 shares, which were represented by one certificate for that amount issued to him in his own name. Later, and in February, 1917, testator directed his son, Alexander H. Handlan, Jr., secretary of the company, to cancel his certificate of 1550 shares and issue to him in lieu thereof 15 certificates for 100 shares each and one certificate for 50 shares. These new certificates were issued upon the stock book of the corporation in testator's name and at his direction were dated September 11, 1916, the date of his golden wedding anniversary. The new certificates were then delivered to testator, whereupon he called another son, Edward R. Handlan, into his office, and in the presence of this son endorsed each of the new certificates in blank, and this son at testator's request affixed his signature as a witness to the several blank endorsements. At that time testator had three envelopes, upon one of which he wrote the following legend:

"Sept. 11th, 1916.

"This is the property of my son, E. W. Handlan, given to him for his faithful work for the firm of Handlan-Buck Mfg. Co.

"A. H. HANDLAN.

"The within shares will be deducted from his interest in my estate at face or par value.

"A. H. HANDLAN."

He wrote a similar legend on each of the other envelopes, one containing the name of his son, E. R. Handlan, the other the name of his son, A. H. Handlan, Jr.

He then separated the new certificates representing the 1550 shares of stock into three separate lots, enclosed the certificates as separated in the three envelopes upon which he had written the legends, then called his third son, E. W. Handlan, who was treasurer of the company, and delivered the envelopes containing the shares of stock to him.

The sons were the only persons present at the time it is claimed the gifts of this stock were made, and necessarily they were the only witnesses who testified on that subject. It appears from their testimony that when the father put the stock in the envelopes, he said to his son, A. H. Handlan, Jr.: "Here's all the stock in the business for you and the boys . . . you have complete control; I have nothing more to do with it; . . . the business belongs to you boys." He said to his son, E. W. Handlan, "I have given you boys this company to keep, because I don't want the sons-in-law or daughters-in-law to have anything to do with this company, especially with the female members of the family." On the same occasion, he said to his son, E. R. Handlan: "Here is the business for you boys. Your brother Ham is in charge and you look to him hereafter for who is in charge of this firm." Later when visiting his son E. R. Handlan, at the army camp, he said to him: "The business is there and I want to know if you are going to stay with it. That is the monument I erected to you boys, and I want to know if you boys are going to stay in it."

Two other witnesses, Stewart Bolson, Mr. Handlan's chauffeur, and a Mr. Teasdale testified to having heard Handlan say to others that he had given the business to the boys; that he was out of business— out to enjoy himself, and the boys were running the place.

Other facts will be stated in connection with the discussion of this question.

"In order to constitute a valid gift of personal property, it is essential that it be delivered by the donor to the donee, or some one for him, with the intention on the part of the donor to part with his right in and dominion over the subject of the gift, and that it be accepted by the donee, whose ownership must take effect immediately

and absolutely, leaving nothing essential to be done in the future.'' [Thomas v. Thomas, 107 Mo. 459, 463, 18 S. W. 27.]

The crucial question in this case is whether or not there was a delivery of the stock to the three sons. When the testator delivered the envelopes containing the certificates of stock to his son, E. W. Handlan, treasurer of the company, the son placed the envelopes in a safe in the vault of the company to which he alone had access. There was another safe in testator's office to which he had access and in which he kept his private papers. The envelopes containing the certificates of stock remained in the vaults of the company until October, 1917, when Alexander H. Handlan, Jr., complained to his father that the stock certificates should not remain in the custody of E. W. Handlan alone. After this complaint was made the testator and two of the sons rented a safe deposit box in the name of the company, at the Mortgage Trust Company in St. Louis. The certificates of stock with other corporate papers and securities were removed from the vault of the company and placed in this safe deposit box, to which there was joint access—that is, any two of the sons or the testator and one son had joint access thereto. The certificates of stock remained in this safe deposit box until after testator's death.

Argument is made that the delivery of the stock certificates to the one son, the treasurer of the company, when considered with the legends written on the envelopes and with what testator said to the sons at the time he wrote the legends and delivered the envelopes containing the stock certificates to the treasurer, clearly show a completed gift of the stock to the three sons. It is true that the legends on the envelopes as well as what testator said to the sons show an intention to give the stock to the sons, but no language, either written or spoken, although expressing an intention to give, will amount to a gift unless that intention is executed by a complete and unconditional delivery of the subject-matter of the gift, or a delivery of the written instrument by which the gift is evidenced. There is no direct evidence in this case of a delivery of the stock except the delivery made to the treasurer of the company. So the question turns on the purpose for which that delivery was made. The treasurer himself testified on this subject as follows:

''Q. What was done with those certificates? A. He gave them to me as treasurer of the company to keep.

''Q. Did he tell you where to put them? A. No, sir.

''Q. He just gave them to you? A. For safekeeping.

''Q. Did he say he was giving them to you for safekeeping? A. Well, I assumed that; I don't remember whether he said those words.''

This evidence shows that testator did not deliver the certificates of stock to the treasurer as donee of a gift, but *as treasurer of the com-*

608

*pany for safekeeping.* The treasurer obeyed the injunction of the testator as to the safekeeping of the stock by placing and keeping it with the other papers and securities of the company where it remained until after testator's death. A similar question was before this court in Tomlinson v. Ellison, 104 Mo. 105, 113, 16 S. W. 20 We there said:

"A delivery may be made to one for the benefit of another person; but, in the case before us, the document in question was delivered to the agent, not of the receiver, but of the giver, to be placed among the papers of the latter, where it remained until death put a stop to his unfinished transactions."

There is no evidence in this case that testator, at the time he delivered the envelopes containing the certificates of stock to the treasurer, or at any other time, ever directed the treasurer to deliver them to the sons or to any one else. The treasurer being a mere custodian of the certificates of stock for safekeeping, with no instructions from testator to deliver them, the title to the stock did not pass, and no valid delivery of the stock could be made after testator's death. [Peters v. Berkemeier, 184 Mo. 393, 402, 83 S. W. 747.]

The subsequent conduct of the father convinces us that he did not intend to and did not make a completed gift of the stock. For more than four years thereafter and to the date of his death he continued to hold the office of president of the company and received and appropriated the substantial salary attached to that office. He continued to vote the 1550 shares of stock either in person or by proxy, and received and appropriated to his own use all dividends declared upon such stock. We are not overlooking the fact that he could have made a present gift of the stock in remainder, reserving unto himself, during his life, the right to vote and control same and receive the income thereon, but there is no evidence that he attempted to make such a gift. Likewise the conduct of the sons indicates that they did not think they would become the owners of the stock until after their father's death. They stood by and saw the father perform all the acts incident to ownership of the stock. They never demanded possession of the stock or attempted to do any act or claim any right incident to its ownership until after the father's death.

For the reasons stated we hold that testator's attempted disposition of the stock in question was testamentary in character and was for that reason invalid, because violative of the statutes governing the testamentary disposition of property.

Contention is made that the circuit court did not have jurisdiction to determine the ownership of the 1550 shares of stock. The claim is that the statute which gives the probate court jurisdiction to discover assets, also gives that court exclusive original jurisdiction to try and determine the title to personal

property as between an estate and an individual who claims to own such personal property. The rule contended for has no application, where, as here, the issue of the ownership of the stock is so inseparably connected with the construction of the will, that it is necessary to determine the ownership of the stock in order to properly construe the will and do complete justice between the parties. There is no question but what the circuit court, sitting as a court of equity, had original jurisdiction to construe the will. Having acquired jurisdiction for that purpose, it was authorized to do complete justice between the parties, and to determine all matters in issue, although such action involved the adjudication of matters of law, as well as matters of equity.

The next question is whether or not the three sons should be charged $200 per share for the 1550 shares of stock. The provision of the will concerning this charge reads as follows:

"I direct that said trustees shall have complete power and control and exclusive management of my business and business affairs embraced within this trust; and to that end shall have title to any and all shares or certificates of stock; or as I separated said stock on my golden wedding day, September 11, 1916, and they are to be charged at the rate of $200 per share for said stock, but this is optional for my sons."

It is contended that the provision in this clause of the will, "and they are to be charged at the rate of $200 per share for said stock," refers to the 700 shares which testator gave to his seven children on his golden wedding day on September 11, 1916, and not to the 1550 shares which he placed in the three envelopes in February, 1917.

The testator gave the 700 shares of stock to his children on September 11, 1916. While the transaction as to the 1550 shares occurred in February, 1917, testator treated it as occurring on September 11, 1916, and so dated all papers and documents involved in the transaction. He having treated his transaction as occurring on September 11, 1916, his golden wedding day, we must so treat it in order to arrive at his true intention. This being true, the fact that this clause of the will refers to the stock as separated on testator's golden wedding day, September 11, 1916, is of no significance, so far as the date is concerned, in determining whether that provision refers to the 700 or the 1550 shares of stock, because testator treats the transaction as to both blocks of stock as occurring on that date. To my mind, the word "separated" as used in this clause of the will has some significance. The testator did separate the 1550 shares of stock into three separate lots, and enclosed each lot in a separate envelope, and deposited the envelopes with the treasurer of the company for safekeeping. He made a gift of the 700 shares of stock. There is a distinction between "giving stock" and "separating stock."

Of course it could be argued that in order to give the 700 shares to the children, it was necessary to first separate the 700 shares from the remainder of the stock, then separate the 700 shares into seven different lots before it could be distributed to the seven children, but that is not the sense in which the testator used the word "separated." Had he intended by this clause of the will to refer to the 700 shares of stock which he had given to his children, the natural and ordinary reference would have been to the stock which he had "given away" rather than to the stock which he had "separated." In view of the fact the testator gave away one block of stock, and separated another block of stock, on his golden wedding day, it would be doing violence to the ordinary meaning of the word "separated" to hold that when testator, in this clause of the will, referred to the stock which he had separated on his golden wedding day, he meant the stock which he had "given away" instead of the stock which he had separated on that day.

The first provision in this clause of the will is that the *trustees* shall have complete control and management of the business embraced in the trust, and to that end shall have title to all shares of stock. The next provision is that *they are to be charged* at the rate of $200 per share for said stock, "but this is optional for my sons." Who are to be charged? There is no question but what the charge is to be made against the sons, either in their capacity as trustees or as individuals, because no reference is made to anyone else. The fact that the charge is made optional for them as sons, and not as trustees, indicates that it was the intention of the testator that they, as individuals, should be charged at the rate of $200 per share for the 1550 shares of stock in event they should exercise their option to take such stock as a part of their distributive share of the trust property.

The next question is, when this option should be exercised. The provisions of the will indicate that the testator intended that the option should be exercised at the end of the trust period. Clause (d) of paragraph fourteen of the will directs that the trustees shall quarter-annually *each year* pay to his three daughters and granddaughter thirteen per cent of the net income from the property held by them as trustees, and sixteen per cent of the next income from such property to his three sons, not including the dividend on the Handlan-Buck Manufacturing Company stock, *held by them as trustees*. This is a clear provision that the trustees shall hold title to the stock in question, although the payment of quarter-annual dividends is withheld from the beneficiaries. Clause (c) of the same paragraph of the will explains why quarterly payments of the income from this stock are withheld. That clause reads, in part, as follows:

"I do especially empower my said trustee to so regulate the action of the board of directors of the Handlan-Buck Manufacturing Company . . . so long as my said trustees hold stock in said corporation, . . . so as to create a surplus. And I do especially empower my said trustees to transfer qualifying shares of stock in order to accomplish the selection of a suitable number of persons as directors. . . .

"I suggest that dividends of said corporation . . . be kept and maintained as far as possible, keeping in mind the proper conduct of the business, at ten per cent per annum for a period of ten years after my death. I believe that by following this suggestion the directors of said corporation shall create a surplus sufficient to make it unnecessary to borrow large sums of money."

Clause (b) of paragraph fourteen of the will which gives the sons the option to take the stock at the rate of $200 per share, also provides that the trustees shall have complete power and control and the exclusive management of testator's business and business affairs embraced within the trust, and to that end *shall have title to any and all shares of stock.*

These provisions of the will indicate that the testator intended to keep Handlan-Buck Manufacturing Company under the control and management of the trustees during the trust period. The provision that the trustees shall have title to any and all shares of stock; that they shall arrange for the selection of suitable persons as directors; that they shall so regulate the action of the board of directors as to create a surplus, and the suggestion that the dividends of the corporation be kept at ten per cent per annum for a period of ten years in order to create a surplus, are all inconsistent with the idea that anyone other than the trustees should hold a majority of the stock and thus be in control of the corporation. The 1550 shares of stock in question is a majority of the capital stock of the corporation. If the sons should be permitted to exercise their option and take this stock immediately after testator's death, or at any time during the trust period, the result of such action would be to withdraw this stock from the trust, wrest the control of the corporation from the trustees, and place it in the hands of the sons or any outsider to whom the sons might see fit to sell the stock. Such a procedure would be contrary to the intention and purpose of the testator as evidenced by the provision in his will. We, therefore, hold that the 1550 shares of stock together with the income therefrom is trust property and should be under the control and management of the trustees during the entire period of the trust, to be handled by them as the will directs. At the end of the trust period, such stock should be distributed among all the beneficiaries of the trust in the proportions provided in the will, unless the sons, at that time, ex-

ercise their option to take the stock, in which event they should be charged at the rate of $200 per share therefor, without interest.

We construe the will as giving the stock to the sons, in event they elect to take it, in the proportions that it was separated and placed in the envelopes by the testator on his golden wedding day. Within a week after testator's death, the sons opened the envelopes and found that the stock had been separated in the following proportions: 400 shares to Eugene W. Handlan, 800 shares to Alexander H. Handlan, Jr., and 350 shares to Edward R. Handlan. At this time the sons took possession of the stock, had it transferred on the books of the corporation in their respective names, in the proportions above set out, and have had possession and control of such stock since that time. They each should be required to return this stock together with all income received thereon, to the trustees, to be handled by them as the will directs and finally disposed of at the end of the trust period in the manner heretofore indicated.

Mollie A. Handlan, widow of testator, died in March, 1924, about three years after testator's death. The administrators of her estate make claim to one-eighth or a child's share in the personal estate of testator. This claim is based on Section 319, Revised Statutes 1919, now Section 323, Revised Statutes 1929. That section reads as follows:

"When the husband or wife shall die, leaving a child or children or other descendants, the widow or widower shall be entitled absolutely to a share in the personal estate belonging to the husband or wife at the time of his or her death, equal to the share of a child of such deceased husband or wife."

The contention is that this statute gives the widow an absolute right to share in the personal property belonging to her deceased husband's estate equal to the share of a child, which she takes by force of the statute, without election and without reference to the will.

This contention correctly states the law. Under the express terms of the statute invoked, this widow was entitled to a child's share in the personal estate as her absolute property. No provision in testator's will could take from the widow that which the law gave her, without her consent. However, if it appears from the will that testator intended to dispose of the share in the personal estate which the law gave to the widow and attempted to compensate her therefor by giving her in lieu thereof a substantial gift out of property which he owned and had a right to dispose of, the question is, can she lawfully take both the child's share and the bequest under the will? In other words, is she entitled to take under both the law and the will? The solution of this question depends upon whether or not the testator intended the bequest in the will to be in lieu of or in ad-

dition to that which the law gave the widow. Of course testator had no lawful right to dispose of the child's share in the personal estate which the law gave to his widow, but if he intended to do so, and intended to compensate her therefor by giving her a substantial sum out of his own property which he had a lawful right to dispose of, she cannot accept the provision made for her in the will, without allowing her property to be disposed of as the will directs. [Wood v. Trust Co., 265 Mo. 511, 525, 178 S. W. 201; Moseley v. Bogy, 198 S. W. 847, 848; 40 Cyc. 1959.]

The will confirmed a gift of the residence property in the city of St. Louis which testator had theretofore deeded to his wife, gave her all furnishings in the residence and all of testator's automobiles and jewelry. In addition to this, the will gave her the sum of $12,000 per annum and directed his trustees to pay said sum to her in monthly installments on the first day of each and every month. After making these and certain other specific bequests, the will contains the following provision: "*All the rest, residue and remainder of my estate,* of whatsoever kind and wherever situated, real, personal or mixed, I devise and bequeath to my sons (naming them) in trust . . . ." Whether or not the words, "all the rest, residue and remainder of my estate" include the widow's share in the personal property, depends upon the sense in which the testator used them. The word "estate" as used in wills, does not necessarily mean the interest which one may have in certain property. It may mean the property itself. When applied to real estate the word is sometimes construed to mean the testator's specific lands and not his quantity of interest therein. The word "estate" has been held to be synonymous with the word "property." [Moseley v. Bogy, 198 S. W. 847, 849.] Our task is to determine the sense in which the testator used the word "estate." That is, did he intend to bequeath his interest in the residue of his property in trust, to the exclusion of the interest which the law gave the widow in the personal property, or did he intend to bequeath all the residue of his property, in trust, including the widow's interest therein, and compensate her for such interest by the $12,000 annual annuity and the other property which the will gives her. His intention in this regard should be determined in the light of all provisions of the will.

The will gives the trustees unlimited power to manage, sell and dispose of all real and personal property embraced in the trust. This provision is inconsistent with the idea that the testator intended that his widow should be the absolute owner of one-eighth of the personal property by reason of which she would be entitled to have something to say about its management, sale or disposition. The operation of the Handlan-Buck Manufacturing Company was testator's principal business. The will provides that the trustees shall have com-

614

plete power and control and the exclusive management of testator's business an'd business affairs within the trust, and to that end shall have title to any and all shares or certificates of stock. This provision is likewise inconsistent with the idea that testator intended that his widow should be the absolute owner of one-eighth of such stock. The will also directs the trustees to see that proper persons are elected as members of the board of directors of said corporation, to so regulate the action of the board of directors that a surplus will be created, and suggests that the dividends of said corporation be kept at ten per cent per annum for a period of ten years after testator's death for the purpose of creating a surplus sufficient to make it unnecessary for said corporation to borrow large sums of money. These provisions are consistent with testator's direction that the trustees shall have complete power and control and exclusive management of his business and business affairs an'd to that end shall have title to all shares of stock.

There is no question but what the will made substantial and adequate provisions for the widow. In addition to the other property she received, the $12,000 annual annuity which the will gave her amounted to an annual income of practically thirteen per cent on a one-eighth share of the personal property which was valued at approximately $93,000.

For the reasons stated, we hold that testator intended to leave all the residue of his property in trust, with the legal title thereto and the exclusive management and control thereof in the trustees, and intended that his widow should take the substantial provision made for her in the will in lieu of her interest in the personal property within the trust. This being true, the widow was put to her election as to whether she would claim under the will or claim the share of the personal property which the statute gave her. [Moseley v. Bogy, 198 S. W. 847, 849.] While there is no statute requiring her to elect, under the circumstances shown, equity requires an election. [40 Cyc. 1959.] The next question is did she make an election? She at no time made any claim to an interest in the personal property. On the contrary, she accepted the property which the will gave her, and up to the date of her death accepted the $12,000 annuity which was paid to her monthly in accordance with the provisions of the will. Her act in accepting what the will gave her, in view of testator's intention as expressed in the will, amounted to an election to take under the will and not under the law. The right of election being a personal right and not transmissible by descent, the election made by the widow is conclusive on her personal representatives, the result of which is that such representatives have no interest in deceased's personal estate.

The trial court held that the widow was entitled to dower in the real estate, and allowed the representatives of the deceased widow's

estate the sum of $2280.64, said amount being one-third of the net income derived from the real estate between the date of testator's death and the date of the widow's death.

The will placed the real estate as well as the personal property in the trust, and under the complete control and exclusive management of the trustees, and directed that the trust should continue for a period of twenty years. If the widow was entitled to dower, she could have insisted that it be set off to her and thereby have withdrawn one-third of the real estate from the trust. To permit her to take under the will a $12,000 annual income from the trust property and at the same time withdraw from the trust, for her sole and separate use, one-third of the lands from which, a substantial part at least, of the $12,000 income was derived, would be inconsistent with the will and contrary to the intention and purpose of the testator. For these reasons, as well as the reasons heretofore advanced regarding the widow's right to a share in the personal property, we hold that the will evinces a clear intention on the part of the testator that the provisions which the will made for the widow were to be in lieu of her dower interest in the real estate as well as her statutory rights in the personal property. It is true that a gift of personal property to a widow does not bar her dower in the real estate, unless it appears, as in this case, that the gift was made in lieu of dower, in which event she cannot accept the gift and keep her dower in the real estate. [In re Goessling v. Goessling, 287 Mo. 663, 680, 230 S. W. 613.] The widow's election to take under the will barred her right to dower in the real estate. It therefore results that the trial court erred in allowing the personal representatives of the widow the net income on a dower interest which the widow had forfeited by her election to take under the will.

The next question presented is whether or not appellant Methudy Tire & Rubber Company should be required to pay interest on the purchase price of certain real property which said company had contracted to buy from the Handlan estate.

There seems to be no dispute about the facts. The amount due on the purchase price on March 31, 1926, was $100,800. On that date said company tendered that amount to the executors and demanded a deed to the property. The executors tendered a deed executed by themselves as executors and trustees of the estate. The company refused to accept the deed on the ground that it was advised by a title examining corporation that the authority which the will attempted to give the executors and trustees to sell and convey the real estate was violative of the rule against perpetuities, and for that reason the title tendered was defective. It appears from what we have heretofore said on the perpetuity question and on the executors'

and trustees' authority to sell and convey the real estate, that there is no basis for this contention. Defendant now admits in its brief filed in this court that the executors had authority to convey a good title, but contends that it should not be required to pay interest. The debt was due on March 31, 1926, the date the deed was tendered, and the purchaser has been in possession of the property during all the times in question. We know of no reason why it should not pay interest. The trial court held that the deed tendered conveyed a good title and that the purchaser should be required to pay six per cent interest from March 31, 1926, the date the deed was tendered. We approve that holding.

It is urged by some of the respondents that we should direct the removal of the present trustees, and the appointment of others in their stead to execute the trust. We do not find sufficient substantial evidence in the record to warrant such action.

We have neither cited nor discussed many of the cases cited in the numerous briefs filed in these cases. But after giving these cases careful consideration, we are satisfied with the conclusions we have reached.

For the reasons stated, the judgment below is reversed and the several causes are remanded to the circuit court with directions to that court to enter a judgment in conformity with this opinion. All concur, *Ragland, J.,* in the result only.