In the Matter of the ESTATE of William Lewis SIMMS, Deceased.

Leslie Clay SMITH, Appellant,

v.

COMMERCE TRUST COMPANY, Co-Executor, Respondent.

No. 52575.

Supreme Court of Missouri, Division No. 2.

Jan. 8, 1968.

Motion for Rehearing or to Transfer to Court En Banc Denied Feb. 12, 1968.

Rufus Burrus, Independence, for appellant.

Johnson, Lucas, Bush & Snapp, Hilary A. Bush, Kent Snapp, Kansas City, for respondent.

STOCKARD, Commissioner.

Leslie Clay Smith, herein referred to as "Claimant," filed a claim in two counts against the estate of his uncle, William Lewis Simms, deceased, in the probate court of Jackson County. The first count was for services rendered to the deceased during his lifetime. The second was to determine title to a bank account in the amount of $25,400.07. The judgment of the probate court as to Count I was in favor of claimant in the amount of $3,959.00; as to Count II it was in favor of the estate. Claimant appealed to the Circuit Court of Jackson County, a separate trial was had as to Count II, and the judgment of the probate court as to that count was affirmed. Claimant has appealed to this court.

The record before the probate court is rather voluminous, and it pertained to the issues of Count I as well as to Count II. That testimony is before this court. Additional testimony was taken before the trial court, including testimony of the claimant to which respondent objected on the basis of the "dead man's statute." Claimant contended that the prohibitions of that statute had been waived. The trial court permitted the testimony, reserved its ruling, and subsequently sustained the objection and excluded the testimony from its consideration, but commented that if it had taken the testimony into consideration it "would not have changed or modified the findings of fact, conclusions of law, and judgment."

Claimant contends on this appeal that the trial court erred in sustaining the objection to his testimony, but he admits that "as a practical matter it may be that such error was harmless." We do not need to decide whether the ruling of the trial court was error. The testimony is before us, we review this court tried case de novo, and we shall do so taking into consideration the testimony of claimant and shall afford it such weight as we determine it merits.

The evidence clearly establishes that for several years, at least ten or twelve, before the death of Mr. Simms, he and his nephew, claimant in this case, occupied a confidential relationship. Claimant assisted Mr. Simms when ill, paid bills for him and performed many helpful tasks that his uncle could not do, or which would have been inconvenient for him to have performed. For some undisclosed period of time claimant had authority to write checks on a checking account of Mr. Simms in the Commerce Trust Company.

In 1951 Mr. Simms executed a will which had been drafted by Mr. David Dabbs a lawyer and personal friend of Mr. Simms. This will was in effect at the time of Mr. Simms' death, subject to the provisions of a codicil hereafter mentioned, and was admitted to probate. The will was before the probate judge as a part of the file, but we do not find its complete terms in the record before us. However, it did provide for a trust with two sisters of Mr. Simms being named as beneficiaries. Both of these sisters died prior to April 1962. During that month Mr. Simms arranged for Mr. Dabbs to bring the will to his home, and Mr. Simms wanted to know if he would have to write a new will in view of the death of his two sisters. He was advised by Mr. Dabbs that the provision for a trust was "obsolete" and a new will was not necessary. According to Mr. Dabbs, Mr. Simms then read the will "line by line" and stated that it provided for exactly what he wanted. In July 1962, or shortly thereafter, Mr. Simms called Mr. Dabbs on the tele-

phone and asked him if he was "sure" that he did not need to change his will by reason of the death of his two sisters, and he was again assured that no change was required. Mr. Simms again stated that with the trust provision being obsolete the will was "just what he wanted." This will provided that the Commerce Trust Company should be executor and that Mr. Dabbs should be attorney for the estate. Claimant was named as a beneficiary.

In October 1962 Mr. Simms was a patient at St. Luke's Hospital. According to claimant, Mr. Simms told him that he wanted him (claimant) to arrange to have a power of attorney prepared designating claimant as his attorney in fact to transfer various bank accounts to one account, and "he wanted them put in my name." Claimant asked if he had an attorney, and Mr. Simms said he did not. Claimant then asked "how about the attorney who drew your will," and, according to claimant, Mr. Simms replied, "I haven't heard from him for years and as far as I know he may be dead." Mr. Simms then asked if claimant knew an attorney, and he replied that he did and he mentioned that Mr. James B. Nourse handled some legal work for the business where he was credit manager, and Mr. Simms said, "Well, have it done."

On October 8 claimant told Mr. Nourse that Mr. Simms wanted to see him, and Mr. Nourse went to the hospital that day. According to Mr. Nourse, Mr. Simms said to him, "I want a will," and further stated that he was single, 86 years of age, and facing a prostate operation. He said that he "had in mind" remembering four of his nephews and nieces and that he desired that claimant be the executor. Mr. Simms' further instructions, according to Mr. Nourse were as follows: "Immediately I want a power of attorney to take care of the present situation. I don't want to be bothered with any details. Clay Smith [claimant] knows what I want. There are quite a few of bank accounts. I want them placed into one account. It will be a check-

ing account. If there is anything after I get through all of this and after Clay has taken care of me, I deem Clay to be a son. Then I want Clay to have whatever remains of the cash in bank."

Pursuant to these instructions, Mr. Nourse prepared a power of attorney, using a printed form, providing that Mr. Simms thereby named and appointed "L. Clay Smith true and lawful attorney for me and in name, place and stead to make deposits and make withdrawals in each and every one of my bank accounts, namely [here were listed four banks in Kansas City, one in Columbia, Missouri, one in Boonville, Missouri, and one in Wichita, Kansas] to receive and pay out moneys for my account or otherwise as may be deemed best by my attorney in fact, to enter into and upon and take possession of each and everyone of my safe deposit boxes wherein my personal papers are located and kept, specifically in the Commerce Trust Company and the Plaza National Bank; to care and provide for my maintenance, care and support, giving and granting to my said attorney full power and authority to do and perform all and every act and thing whatsoever, requisite and necessary to be done in and about the premises, as fully to all intents and purposes, as I might or could do if personally present at the doing thereof, with full power of substitution or revocation, hereby ratifying and confirming all that my said attorney, or his substitute, may or shall lawfully do, or cause to be done, by virtue hereof." This power of attorney was signed by Mr. Simms on October 11, 1962, before two witnesses one of whom was his medical doctor, and was acknowledged by Mr. Nourse.

On November 5, 1962, Mr. Nourse went to the Commerce Trust Company with claimant, apparently having the executed power of attorney with them, and talked to Mr. Wuerth at the bank. According to Mr. Nourse and claimant, it was at the suggestion of Mr. Wuerth that an account was opened at the Commerce Trust Company in

the name of "L. Clay Smith, Trustee." Thereafter, the funds from all of the banks listed in the power of attorney were transferred to this trustee account except the funds in the accounts in the name of Mr. Simms in the Commerce Trust Company and in the bank at Boonville, Missouri. Claimant testified that he "didn't see any reason" to transfer the account in the Commerce Trust Company to the trustee account because he had "connection" with that account. This was the account upon which he previously had the authority to write checks. The total amount transferred to the account in the name of "L. Clay Smith, Trustee" was $29,189.97. Prior to the death of Mr. Simms, claimant wrote several checks, all but one of which were to pay expenses and bills of Mr. Simms or to provide money to him for his personal use. One check in the amount of $1,309.00 was to claimant, and he testified that it was for "services for two months," and that it was made "on the suggestion" of Mr. Simms to "take care of my time." There is no contention that claimant improperly used any of the funds. The balance in the account at the death of Mr. Simms on December 12, 1962, was $25,400.07.

On October 10, Mr. Nourse learned that Mr. Simms already had a will, and apparently claimant furnished him a copy. Claimant testified that Mr. Simms wanted him to be the executor of his estate, but claimant told him that he "wouldn't want to be the executor" and that the Commerce Trust Company was executor. Mr. Simms then said, "Well, I'll make you coexecutor." According to claimant, Mr. Simms said that he wanted Mr. Nourse to be attorney for his estate. Mr. Nourse prepared a codicil which provided that claimant was to be coexecutor of the estate with the Commerce Trust Company, and that Mr. Nourse was to be the attorney. It made no other changes in the will. This codicil was executed on October 13. Mr. Nourse testified that he had "an uncompleted instruction to prepare a will," but he determined that it should be handled in the interim by the codicil.

There is some confusion in the record concerning the preparation of a second codicil. At one time Mr. Nourse testified that the drafting of a second codicil was completed on November 6. However, he later stated that this second codicil was first discussed on November 20, and that it was written in final form on December 4, 5 and 6. This second codicil was never executed by Mr. Simms, but as finally drafted by Mr. Nourse, it provided that claimant should "be paid for services rendered me over the years and for services which he is now rendering * * * in addition to my bequests to him."

In the conversation which led to the preparation of this second codicil, according to Mr. Nourse, Mr. Simms stated: "I am exceedingly disturbed and worried about Clay. Clay has had a setback. I want no misunderstandings. I want Clay to be protected and paid—if not for his services, then in the alternative I want Clay to have my International Harvester Company Stock." The issues pertaining to Count I are not before us, but by that count claimant sought and was awarded compensation for services rendered.

In the process of assembling the assets of the estate, upon the request of the representative of the Commerce Trust Company as co-executor, claimant transferred the funds in the trust account to the account in the name of the estate, but he made it perfectly clear that he considered the funds in the trust account to belong to him personally.

At the trial before the circuit court claimant testified that Mr. Simms had given him oral instructions to put the money from the various accounts into one account in his (claimant's) name. He testified that he did not claim the money belonged to him prior to the death of Mr. Simms, but he claimed that the part not used for Mr. Simms' needs and care was to go to him at

the death of Mr. Simms. He stated that he drew nothing from the account without the authority of his uncle and that his uncle saw every transaction.

The trial court entered findings of fact to the effect that Mr. Simms did not intend to make a gift to claimant of the funds placed in the trust account or to transfer the title to the funds to claimant until after his death; that there was no delivery of the funds "as to immediately divert deceased of any title to or right of dominion" over the funds; and that claimant was holding the funds "as agent for the deceased, and was charged with a legal duty to use any part or all of said funds for the use and benefit of deceased, so long as deceased lived." The trial court's conclusions of law were that claimant's evidence failed to establish a gift *inter vivos* or *causa mortis,* and that an attempted gift to take effect on the death of the donor is void as in violation of the statute of wills.

In his brief to this court claimant challenges the findings of fact and conclusions of the trial court because as he asserts generally, the evidence established that Mr. Simms "intended the transfer to be a present gift and to be the property of claimant." We cannot determine with certainty whether claimant contends that the transfer of the funds constituted a gift *inter vivos* or a gift *causa mortis.* The trial court held it to be neither. In his points in his brief claimant seems to attack only the holding pertaining to a gift *inter vivos.* However, some of the authorities cited and relied on pertain to a gift *causa mortis.*

■ The law pertaining to gifts is well settled, and we need state only general principles. The essentials of a valid gift *inter vivos* of personal property are a present intention to make a gift on the part of the donor, a delivery of the property by the donor to the donee, and an acceptance by the donee, whose ownership takes effect immediately and absolutely. Michaelson v. Wolf, 364 Mo. 356, 261 S.W.2d 918,

924; Trautz v. Lemp, 329 Mo. 580, 46 S.W. 2d 135, 144.

■ The writings in this case, that is, the power of attorney and the first codicil to Mr. Simms' will, do not afford any basis whatever for the conclusion that Mr. Simms ever had the intention to make a gift to claimant. In fact, they provide circumstantial evidence that he had no such intention. Mr. Simms was a successful business man, and he appreciated the significance of a will. He understood that his intention as to the disposition of his property, in view of changing circumstances, had to be expressed therein. This is evidence by the fact that after the death of his two sisters who were beneficiaries of a trust provided for in his will, he obtained legal advice whether or not it was necessary to change his will. The power of attorney and the codicil to his will were prepared by an attorney, who of course understood and appreciated the legal significance of the words used in each instrument, and presumably, in his attorney-client relationship, advised Mr. Simms. Yet, the writing entitled a power of attorney in no way whatever purported to carry out any wish or intent on the part of Mr. Simms that ownership of the funds should be in claimant. The same is true as to the codicil. By the codicil Mr. Simms changed his will in two respects and reaffirmed the remainder of it, and in this manner expressed approval of the provision in that will for claimant which did not include ownership of the funds in the trust account. Even if we should consider the terms of the unexecuted second codicil, it expressed no intention on the part of Mr. Simms that claimant should become the owner of the trust account. Therefore, if any intent on the part of Mr. Simms existed that claimant should become the owner of the money in the trust account, or of the balance remaining at his death, it must be found in the oral statements attributed to him.

Although oral statements attributed to a person, who by reason of death can neither

affirm nor deny, should be received with caution, we have no reason to doubt or question that Mr. Simms said what the witnesses testified he said concerning his intent as to the funds placed in the trust account pursuant to the power of attorney. Mr. Nourse testified that Mr. Simms said that he wanted a "power of attorney to take care of the present situation," and that he wanted his several bank accounts placed in one checking account." Mr. Simms further said, according to Mr. Nourse, that "if there is anything [in that checking account] after I get through all of this and after [claimant] has taken care of me * * * I want Clay to have whatever remains of the cash in the bank." Mr. Nourse also testified that Mr. Simms said that he wanted claimant "taken care of" and that he "expected [him] to have any residue of any monies in hand or in bank." At another time Mr. Nourse testified that Mr. Simms said he wanted claimant "to be protected and paid—if not for his services, then in the alternative I want [him] to have my International Harvester stock." In this latter statement no reference was made to the trust account, and we note that according to claimant he drew a check on the trust fund in the amount of $1,309.00 at the specific direction of Mr. Simms to compensate him for his "services for two months." Claimant's son testified that he heard Mr. Simms say to claimant, in reference to the trust account, "I expect you to have whatever is left" and "Whatever is left from this amount I expect to go to you." Mary Marshall, a friend of Mr. Simms and a nurse, testified on deposition that Mr. Simms had $28,000 or $30,000 which "he hoped would take care of him as long as he lived," and that "he had given that to [claimant] with the understanding * * * [that claimant] was to take care of him as long as he lived and then the rest was to be [claimant's], if there was any left." When we accept these oral statements attributed to Mr. Simms they not only do not indicate, but they refute, an intention on the part of Mr. Simms, at the time of the execution of the power of attorney, and at the time of the surrounding circumstances, to make an irrevocable gift of the trust account to claimant. This was claimant's view of the transaction. He testified that he did not claim the money was his prior to the death of Mr. Simms, that Mr. Simms had the right to use any or all of it, and that he drew nothing from the trust account without authority from Mr. Simms. The evidence does not authorize a finding that Mr. Simms intended to make a gift inter vivos to claimant.

■ The transaction seems to have more of the features of a gift *causa mortis,* but it does not meet the minimum requirements of that form of a gift. As a rule, a gift *causa mortis* is made under circumstances which preclude a formal transaction. 38 C.J.S. Gifts § 76, p. 899. This was not the situation in this case because a part of the transaction was the formal execution of a power of attorney which did not provide for a gift, but instead provided for claimant to ·act as agent to control and manage certain property of Mr. Simms which is the same property now contended to constitute the subject of the gift. Also, Mr. Simms subsequently executed a codicil to his will, a transaction more formal than the execution of the power of attorney. It has been said that gifts *causa mortis* are not favored in the law because they conflict with the general policy of the law relating to the disposition of the estates of deceased persons and the statute of wills. McDonough v. Portland Savings Bank, 136 Me. 71, 1 A.2d 768. See the excellent and thorough discussion of gifts *causa mortis,* including the history of the doctrine, in Foster v. Reiss, 18 N.J. 41, 112 A.2d 553, 48 A.L.R.2d 1391. While a gift *causa mortis* is made in expectation of death, and is conditional on the occurrence of death, there must be the intent on the part of the donor to pass title of the property to the donee at the time of the delivery. Slager v. Allen, Mo.App., 220 S.W.2d 752; Albright v. Davis, Mo.App., 64 S.W.2d 121; Kling v. McCabe, 8 Cir., 36 F.2d 337; Foster v. Reiss, supra; King v. Merryman,

196 Va. 844, 86 S.E.2d 141; In re: Gallinger's Estate, 31 Wash.2d 823, 199 P.2d 575; O'Mara v. Dentinger, 271 App.Div. 22, 62 N.Y.S.2d 282; Barham v. Khoury, 78 Cal.App.2d 204, 177 P.2d 579; 38 C.J.S. Gifts § 77; 24 Am.Jur., Gifts § 21. The intention must be to make a present gift, and to surrender the property during the donor's life, subject to the right of revocation if death does not occur. In this case, the evidence does not support a finding of an intent to make a present gift or to surrender control of the property during the lifetime of the donor or until revoked. Mr. Simms did not say, in effect, that he gave claimant the money to be his if he did not recover. Instead he said, in effect, that he turned the money over to claimant to use for his, the donor's, benefit, and that if donor did not use it all, then the balance should then at the time of the donor's death become the property of claimant. This was an attempt to pass the title of property at the time of death without complying with the formal requirements of the statute of wills, Section 474.320 RSMo 1959, V.A.M.S. and for that reason the attempted gift was of no effect.

Claimant cites and relies on several cases which we shall consider briefly. In Starks v. Lincoln, 316 Mo. 483, 291 S.W. 132, the donor indorsed several notes without recourse and gave them along with two personal checks to A. W. Lincoln who was then president of the board of trustees of the donor's church. The checks were cashed and a bank account was opened in the name of "A. W. Lincoln, Trustee." The donor also conveyed some real estate to Mr. Lincoln as trustee with directions that it be sold and the proceeds be used to pay certain indebtedness and make specified gifts. Mr. Lincoln disclaimed any personal interest in the property, but asserted that he held it in trust for the church for certain specified uses. The court held that the "declarations of the deceased made after such delivery and before her death indicate an absolute, irrevocable gift, immediately effective, having no reference to the future and in no sense conditional upon the fatal termination of the donor's illness," and further that the property "was given outright while the donor was yet alive to defendant as trustee for the improvement of the buildings of this particular church, and the gift constituted an executed trust."

Michaelson v. Wolf, 364 Mo. 356, 261 S.W.2d 918, pertained to the situation where the trial court directed a verdict, and this court held that under all the circumstances there was a fact issue for the jury on the issue of whether a transfer constituted a gift. General principles were stated with which we find no fault.

Albright v. Davis, Mo.App., 64 S.W.2d 121, pertained to a gift *causa mortis*, and the judgment was reversed because of an error in an instruction. However, it was said therein that "to constitute a valid gift causa mortis, the gift must be fully executed as distinguished from a mere executory gift; but the gift, though fully executed, is nevertheless a conditional and revocable gift."

Deneff v. Helms, 42 Or. 161, 70 P. 390, also pertains to a gift *causa mortis*, and the court found that "It is clearly manifest from what he said and did that it was his present purpose to part with the title to the money, and bestow it upon his sister, after the payment of the specified expenses and charges, which he directed Helms [the one to whom delivery was made] to see to."

Edson v. Lucas, Commissioner of Internal Revenue, 8 Cir., 40 F.2d 398, contains a lengthy opinion with complicated facts not comparable to those of this case. The court found that "After Mrs. Edson parted with this property, in 1919, she had neither the legal title, nor possession, nor control, nor the income, nor the proceeds * * *."

These cases cited by claimant state general legal principles which when applied to

the facts of this pending case, do not support claimant's contentions.

For the above reasons the judgment of the trial court was correct and is affirmed.

BARRETT and PRITCHARD, CC., concur.

PER CURIAM:

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the Court.

All of the Judges concur.