Jean CAVERS et al., Respondents,

v.

ST. LOUIS UNION TRUST COMPANY
et al., Appellants.

Nos. 36471–36473, 36482 and 36483.

Missouri Court of Appeals,
St. Louis District,
Division Two.

Sept. 16, 1975.

Motion for Rehearing and/or Transfer to
Supreme Court Denied.

Application to Transfer Denied
Jan. 12, 1976.

F. Wm. McCalpin, Michael D. Mulligan, Lewis, Rice, Tucker, Allen & Chubb, St. Louis, for appellants Robert Ashbaugh and others.

Wayne B. Wright, Henry C. Bryan, Jr., McDonald, Wright & Bryan, St. Louis, for appellants Anthony J. Webber and others.

F. X. Cleary, Moser, Marsalek, Carpenter, Cleary, Jaeckel, Keaney & Brown, St. Louis, for appellants Karen L. Michie and others. Raymond Lee Zager, Sherman Oaks, Cal., Norman C. Parker, Mary Ann Weems, for Norman Webber and Lucy Janet Webber Ryan Brown; Flynn & Parker, St. Louis, of counsel.

Harold C. Hanke, Robert H. Batts, Smith, Hanke & Batts, St. Louis, for respondent Frederick Ashbaugh.

William H. Biggs, F. Fairfax Jones, Biggs, Curtis, Casserly & Barnes, St. Louis, for respondents trustees for Florence Murial Nairn and others.

Jon M. Anderson, Wright, Harlor, Morris & Arnold, Columbus, Ohio, for respondent Jean Cavers.

CLEMENS, Presiding Judge.

In 1915 Mrs. Eliza Northrup McMillan died testate in St. Louis survived by one son, William McMillan. By her will Mrs. McMillan made substantial devises and bequests to him and his wife and numerous $5,000 bequests to friends. Insofar as we are now concerned, Mrs. McMillan left the residue of her estate, then valued at over two million dollars, in trust for two groups of people. This 60-year-old trust now is valued at over seventeen million dollars and arguably has terminated; hence the present litigation.

By this suit plaintiffs, who are some of the residuary trust beneficiaries, seek a declaratory judgment to construe Mrs. McMillan's will to determine whether the testamentary trust has terminated and, if terminated, to whom the trust corpus should be paid.

*The core issue*: Plaintiffs contend that when a bequest in trust grants a life annuity to a beneficiary, with the corpus payable on his death to named remaindermen, and the life annuitant relinquishes his annuity, the trust thereby terminates and the corpus becomes immediately payable to the remaindermen. The trial court ruled the trust had terminated and awarded fractional shares of the corpus to five persons, living descendants of eight original remain-

dermen.[1] Appeals were taken by the corporate trustee and persons who contend the trust has not terminated or who claim they now have, or may later become entitled to, shares in the trust corpus.

*The will.* By Eliza McMillan's will, admitted to probate in 1916, she bequeathed the residue of her estate in trust. By Item Fifth the testatrix named a trustee and 43 life annuitants, including Paul Cadwell, to receive for life monthly payments ranging from $25 to $250. All the life annuitants are now dead except Paul Cadwell, now over 85 years old, and he has relinquished his annuity. Additionally, the testatrix named eight persons, or their descendants to receive the trust corpus *upon death of the life annuitants* (or upon other legal termination of the trust?). Each of the eight original remaindermen has died, two without descendants. Living descendants of the other remaindermen contend the trust has terminated, and they accept the proportionate shares of the corpus as ordered distributed by the trial court. Imme-

diate descendants of those distributees (substitutional remaindermen) who might take upon termination if it occurred upon the death of Paul Cadwell, oppose present termination.

*Trust decreed terminated.* The threshold issue is whether the testamentary trust has terminated. Paul Cadwell, the sole survivor of the 43 life annuitants under the trust, has "released and disclaimed" his annuity interest. Did that as a matter of law accelerate the remainder interests of the remaindermen into present interests? The trial court ruled affirmatively on the termination issue, and ordered the corpus distributed as follows: Jean Cavers, 4/24ths; Elizabeth M. Morrison, 3/24ths; Florence J. McLeod, 3/24ths; Trustees of Florence Murial Nairn, 6/24ths; Frederick K. Ashbaugh, 8/24ths. Those parties accept this as the proper division of the corpus.

The relationship and status of the original and successor remaindermen is shown on the following chart:

---

1. The trial court filed detailed findings of fact and conclusions of law, a practice most helpful on appeal.

DEVISEES, LEGATEES AND HEIRS OF ELIZA NORTHRUP McMILLAN

Alexander Saxton    Harriet McConnell         Mary McConnell         George Northrup

Mrs. Mary E. Kingston      Dr. John J. Kingston                        Eliza Northrup McMillan

Grace K.        William      Norah K.       Florence N.     Charles Northrup
Ashbaugh        Kingston     Lawrence       McLeod                          Lady        William
Ashbaugh                                    McLeod            Eula N.        Lucie -- McMillan
                                                             Mabee
FREDERICK
ASHBAUGH (8/24)                  FLORENCE J.    FLORENCE M.
                                 McLEOD         NAIRN (6/24)  Legatees
Kingston                         (3/24)
Ashbaugh                         ELIZABETH M.   FLORENCE M.
           Philip               MORRISON        NAIRN (6/24)
Charles    Ashbaugh             (3/24)
                                                Judith N.    Clara     Norman
Robert  Deborah  Nancy  Steven      Colin  Susan  Karen  Claudia  Michie  Webber  Webber
Minor   Minor    Minor   Minor      Minor  Minor  Minor  Minor                              Anthony  L.J.W.R.
                                                                                            Webber   Brown
                                                                                            Minor
                                                                        Patricia   Mary S.  Timothy
                                                                        Shelton    Gleister Ryan
                                                                        Robert W.  Marcus T.
                                                                        Lanctot    Gleister
                                                                        Minor      Minor

              Lynn Cavers    JEAN CAVERS
                             (4/24)
                 Jennie Cavers

F. William McCalpin guardian ad litem      Francis X. Cleary guardian ad litem      Wayne B. Wright guardian ad litem
for unknown and unborn descendants of      for unknown and unborn descendants       for unknown and unborn descendants
above named persons and for minors.        of above named persons and for minors.   of above named persons and for
                                                                                    minors.

Legend:

| | | | | |    Deceased remaindermen.

CAPS.        Successor remaindermen.

(    )        Share of corpus awarded in trial court.

Names of the eight original remaindermen are marked by broken underlining. Each has died. Names of their living descendants are shown in capital letters, followed in parentheses by the fractional shares of the trust corpus awarded each by the trial court.

Interested persons fall into four groups: (a) The "Jenny Cavers group" is unrelated to the testatrix. (b) In the "Kingston group," Mrs. Mary E. Kingston has died leaving Dr. John Kingston as her widower; he died leaving three children, including William Kingston and Nora Kingston Lawrence, who died without descendants. Their sister, Grace Kingston Ashbaugh, died leaving defendant-respondent Frederick Ashbaugh as her only descendant. He has two living children and five living grandchildren, four of them minors. (c) In the "Northrup group," Charles Northrup died leaving two daughters. Daughter Florence Northrup McLeod died leaving two living daughters, Florence J. McLeod and Elizabeth M. Morrison. Charles Northrup's other daughter, Eula N. Mabee, died leaving one living daughter, Florence M. Nairn; she has one living daughter and four living grandchildren, three of them minors. (d) In the "William McMillan group" are his legatees and their descendants, none of whom is named by testatrix in her will, directly or indirectly. Norman Webber and Lucy J.W.R. Brown claim that as intestate heirs of the testatrix they are now entitled to the lapsed shares of two original remaindermen, William Kingston and Nora L. K. Lawrence, who died without descendants. Others of the "William McMillan group" are Norman's and Lucy's children, who contend the trust has not yet terminated.

■ *Termination by annuitant's relinquishment.* As said, we must initially determine whether the trial court correctly held Paul Cadwell's relinquishment of his annuity, he being the only living annuitant, terminated the trust. In 1972 Paul Cadwell executed two documents whereby he "forever renounce[d], disclaim[ed] and release[d]" his annuity and further assigned to Jean Cavers (a descendant of an original remainderman, Jenny Cavers) all his interest in his $50-a-month annuity. Three months later Jean Cavers surrendered and released to the trustee all her interest in the Cadwell annuity. The trustee's obligation to the annuitants thereby came to an end. We hold this cessation of any purpose for the trust made it "dry" and terminated it. *Trautz v. Lemp*, 329 Mo. 580, 46 S.W.2d 135[16] (1932). This, despite its wording that "after the deaths of . . . Paul Cadwell [and other named life annuitants] . . . this trust shall cease and the property . . . shall be distributed . . . ."

*Acceleration of remainder.* The general rule on acceleration of remainder interests is found in *Commerce Trust Co. v. Fast*, 396 S.W.2d 683, l. c. 688 (Mo.1965). There the will created a trust with income to be paid to daughter Mary and "upon her death" the corpus was to go to testator's other three children. Mary then renounced her life interest in the trust. In construing the will the trial court held Mary's renunciation accelerated the trust remainders into present interests in the testator's other three children, to whom the court ordered the trust corpus distributed. On appeal our supreme court affirmed, saying "the rules applicable to the solution of problems growing out of renunciation are clearly set out in the Restatement, Property. Section 231 declares: 'When an attempted prior interest fails because the person to whom it is limited renounces it, succeeding interests are accelerated except when (a) the terms and circumstances of the limitation manifest a contrary intent . . . .' . . . This [acceleration] occurs in accordance with what is normally to be inferred as the intent of the conveyor, namely, that as each of the successive interests sought to be created by him ends or becomes impossible, the next in order in the limitation should move up." Concerning the testator's use of the words "upon her [Mary's] death" the court added:

"A construction that the 'terms and circumstances of the limitation manifest a contrary intent' is not justified solely by the fact that after limiting a life interest (the renounced interest) it is provided that the gift over shall take effect 'at the death of' the life tenant . . . . Such language is to be construed as referring to the ending of such life interest either in the manner stated or by its renunciation."

*Fast* supports Illustration 9, 2 Restatement of Trusts, Second, § 337, p. 161: "A bequeaths property to B in trust to pay the income to C for life and on C's death to pay the principal to D. C disclaims his interest. D, whose interest is accelerated by the disclaimer, can compel B to convey the trust to him."

The trial court's finding of termination is further supported by *Bennett v. Tower Grove Bank and Trust Company,* 434 S.W.2d 560 (Mo.1968). In that suit three trust remaindermen sued to terminate a trust. Under that trust the testator's daughter was entitled to income from the trust for life, with remainder to the three named plaintiffs. The daughter assigned her interest to the three plaintiffs, who then sued to compel termination. In reversing the trial court's refusal to terminate the trust, the supreme court first found the testator had not affirmatively expressed an intention to preserve the trust corpus for the daughter's life. Following 2 Restatement of Trusts, Second, § 337, the court then held that where a sole beneficiary had conveyed her interest therein to the remaindermen, the remaindermen could compel termination. (Since the sole annuitant had completely assigned her annuity the trust had become "dry," and the remaindermen were entitled to distribution.)

Seeking to avoid termination, guardians for minor and unknown defendants in the "Kingston group," the "Northrup group" and the "William McMillan group" diligent-ly advance numerous arguments against termination before the death of living life annuitant Paul Cadwell. In discussing these contentions we will refer to the three groups collectively as "defendants." [2]

■ *Annuitant's right to relinquish.* The "Kingston group" seeks to nullify Paul Cadwell's relinquishment of his annuity on the ground he could not do so after accepting its benefits for almost 50 years. We see no reason he could not do so. His release was comparable to a life tenant conveying his life estate to the remaindermen.

To support their contention of Paul Cadwell's inability to relinquish defendants cite *Sanders v. Jones,* 347 Mo. 255, 147 S.W.2d 424 (1940), which is readily distinguishable. That case concerned a "renunciation" by a remainderman, not by a life tenant as Paul Cadwell is in our case. There, remainderman Ely Sanders, in order to thwart his creditors attempted to renounce 15 months after the life tenant's death had ripened Ely's estate into a fee title. *Sanders* is irrelevant here.

Conversely, in *Bennett v. Tower Grove Bank and Trust Company,* 434 S.W.2d 560, l. c. 564 (Mo.1968) the court upheld a life-tenant's right to transfer her interest to the remainderman, saying: " . . . Likewise, the daughter's share was given without restraint upon her right to dispose of it. Therefore, she had the right to transfer her interest as she saw fit (1 Rest. of Trusts, 2d, § 132, p. 288) and thereby change the application prescribed by the testator. Since the testator did not see fit to employ any of the numerous devices which would have limited the daughter's power to transfer her interest (See 1 Rest. of Trusts, 2d, § 152, p. 311, § 154, p. 320, § 155, p. 323), we do not feel compelled to read into the language which he employed an intention that the trust should continue in the circumstances here.

2. For present purposes the term "defendants" excludes adult defendants Norman Webber and Lucy Janet Webber Brown, who favor trust termination, but oppose the trial court's excluding them from distribution of the corpus, to which they claim interests as intestate heirs of the testatrix.

Absent other circumstances to show the intention of the testator, we are of the opinion that the mere creation of the trust for successive beneficiaries did not indicate a purpose other than preservation of the corpus for the remaindermen and, therefore, the trust may be terminated by the action here taken. See IV Scott on Trusts, 3rd ed., § 337.1, p. 2664." So it is here.

█ *Estoppel by Kingston.* Defendants argue plaintiffs are estopped from contending for termination by the ruling in *Kingston v. St. Louis Trust Co.,* 348 Mo. 448, 154 S.W.2d 39 (1941). That suit was for construction of the same will now before us. By 1941 some of the life annuitants had died. The plaintiffs did not seek to terminate the trust but instead sought to compel the trustee to pay them partial distribution to the extent of the expired annuities, this on the ground plaintiffs had vested remainders in that portion of the trust. The declared issue was simply whether plaintiffs' remainders were vested or contingent. The court held plaintiffs' interests were contingent on surviving the numerous annuitants. Present defendants rely on language in *Kingston* to the effect that the McMillan trust was not to terminate until the death of all the life annuitants. We do not find this persuasive. The *Kingston* court was not faced with the issue here—termination for a reason other than actual death, namely, relinquishment by a sole life annuitant.

*Intent against termination.* In considering the principle of release by a life annuitant effecting acceleration of the remainder the defendants emphasize—and plaintiffs concede—that rule does not apply when the testator has manifested a contrary intent, by a spendthrift trust, for example. Defendants contend the testatrix did manifest a contrary intent by providing that distribution to the remaindermen became due "after the deaths" of all remaindermen. That contention runs afoul the holding in *Chew v. Keller,* 100 Mo. 362, 13 S.W. 395, l. c. 396 (1890), that "adverbs of time, as 'when,' 'there,' 'after,' 'from,' and like expressions, do not make a contingency, but

merely denote the commencement of the enjoyment of the estate." Applying this principle in *Fast, supra,* 396 S.W.2d l. c. 689, the court held such language refers "to the ending of such life interest either in the manner stated [death] or by its renunciation."

In further contending Mrs. McMillan's will did show an intent contrary to termination before Paul Cadwell's death the defendants first rely on *Crossan v. Crossan,* 303 Mo. 572, 262 S.W. 701 (1924). There the trust remainder was expressly conditioned on the remaindermen giving the annuitant, their mother, tender care during her declining years. The mother renounced but the court ruled against acceleration because the imposed condition did manifest an intent contrary to the termination by the annuitant's relinquishment. Defendants also cite *Tate v. Schoonover,* 462 S.W.2d 792 (Mo.1971), and *St. Louis Union Trust Company v. Kern,* 346 Mo. 643, 142 S.W.2d 493 (1940). In all these cases the testators' provisions for the life tenants showed a specific concern for them. Here, the $50-a-month payment to Paul Cadwell hardly rises to such level of concern that we can say it manifested an affirmative intent by testatrix against acceleration by relinquishment.

█ We hold the testatrix's intent was to hold the corpus of the trust for the purpose of paying the many token annuities; that her direction to distribute the corpus to the remaindermen after the annuitants' deaths did not necessarily mean their literal deaths so as to impose a condition, but referred instead merely to the termination, by death or otherwise, of the preceding estates. (*Commerce Trust Co. v. Fast, supra,* at 396 S.W.2d, l. c. 688, 689). There being no manifest contrary intent by the testatrix, we find termination occurred when Paul Cadwell, the sole surviving annuitant, relinquished his annuity. *Fast* and *Bennett, supra.* The rights of the remaindermen to distribution then became enforceable.

*Substitutional remaindermen.* Members of the "Northrup group," descendants of distributee Florence M. Nairn, contend trust termination at this time would be detrimental to them, since distribution to her, as a primary recipient, deprives them of the possibility of being substitutional remaindermen if Florence Nairn dies before ·Paul Cadwell. In short, they contend the existence of substitutional remaindermen prevents termination. They cite *Kingston, supra,* at 154 S.W.2d l. c. 42. As mentioned hereinbefore, *Kingston* dealt with the hypothetical rights that would accrue upon trust termination by the literal death of the life annuitants; here we are concerned with termination arising from acceleration by cessation of the sole life annuitant's interest. Thus, present contentions of the "Northrup group" are not established by the ruling in *Kingston* ; in fact, the contention of these substitutional remaindermen is refuted by *Commerce Trust Company v. Fast,* 396 S.W.2d 683[5] (Mo.1965). There, the will provided that if any remaindermen had died at the time of termination, then, as here, that share was to be paid to his descendants. The court ruled against the substitutional remaindermen, saying tersely: "The substitutional provisions in favor of more remote descendants are not alone sufficient to prevent acceleration. . . ."

Here, as in *Fast,* the primary objects of the testatrix' bounty were the original remaindermen or their immediate descendants. Provisions for more remote descendants were substitutional, not conditions precedent for termination of the trust. This contention of the "Northrup group" must be denied, and we adhere to our ruling that the trust has terminated in favor of the present living remaindermen.

*The two lapsed legacies.* The "William McMillan group" presents different issues. Defendants Norman Webber and Lucy J. W. R. Brown contend that since two of the eight original remaindermen, William Kingston and Norah K. Lawrence, died without descendants, their two proportionate shares of the trust lapsed, and as to those two shares their great-grandmother, testatrix Eliza McMillan, died intestate. Norman and Lucy contend for termination now but against the distribution ordered which excluded them.

Other members of the "William McMillan group," Norman's and Lucy's living descendants, agree Norman and Lucy are entitled to take as heirs of Eliza McMillan, but only if alive when the trust terminates upon Paul Cadwell's death. They oppose termination. We have ruled the trust was terminated by Paul Cadwell's relinquishment. That disposes of the claim of these remote descendants of Eliza McMillan, but still leaves the issue of Norman's and Lucy's claims as intestate heirs of Eliza McMillan.

The key to this issue is the nature of Eliza McMillan's bequest in trust to the original eight remaindermen. If it was a gift to them collectively as a group, the shares of William Kingston and Norah K. Lawrence passed upon their deaths to the five surviving members of that group, as decreed by the trial court. Conversely, if the bequest in trust was a gift to each remainderman as an individual, then argue Norman and Lucy, the testatrix died intestate as to the shares of William Kingston and Norah K. Lawrence and those two shares passed upon their deaths to Norman and Lucy as Eliza McMillan's intestate heirs. The "William McMillan group" claims they are successors to Eliza McMillan's sole heir at law, her son William McMillan.

Reverting to the testatrix' will, note that it provided that upon death of the 43 annuitants (or upon termination by acceleration, as we have ruled) the trust corpus was to be "distributed equally, share and share alike, among and paid to the said [eight named remaindermen] and their respective descendants . . . per stirpes and not per capita . . . ."

As said, two of the eight original remaindermen, William Kingston and Norah K.

Lawrence, died without descendants. So, those two shares of the trust lapsed, either in favor of other members of the group collectively, as plaintiffs contend and the trial court held, or in favor of Eliza McMillan's intestate heirs, as all the "William McMillan group" now contend.

We explore Eliza McMillan's will to determine her intent as to her bequest to the group of eight original remaindermen and as to who is to take the two shares that lapsed—other members of the group of eight residuary remaindermen or Eliza's intestate heirs.

■ By statute and common law the testatrix' intent controls in interpreting her will. Section 474.430, RSMo. declares: "All courts and others concerned in the execution of last wills shall have due regard to the directions of the will, and the true intent and meaning of the testator, in all matters brought before them." As said in *Legg v. Wagner,* 155 S.W.2d 146[1] (Mo. 1941): "In construing the will certain rules for construction must be considered. The true intent of the testator must be determined. The controlling rule in construing wills in this state, to which all technical rules of construction must give way, is to give effect to the true intent and meaning of the testator as the same may be gathered from the whole instrument, if not violative of some established rule of law.'"

The "McMillan group" contends that by failing to provide for the contingency of William Kingston and Norah K. Lawrence dying without descendants before the trust terminated the testatrix intended those two shares were to pass by intestate succession to her heirs.

"It will be presumed that the testator intended to dispose of his entire estate. . . ." *Legg v. Wagner, supra.* This principle against intestacy was stressed in *Shaw v. Wertz,* 369 S.W.2d 215[8–13] (Mo. 1963): " . . . when a provision in a will is fairly open to more than one construction, that construction which results in intestacy, particularly when the will otherwise indicates that partial intestacy was not intended, will not be adopted if it can be avoided by any other reasonable construction."

■ We look to the words of Eliza McMillan's will to determine whether she intended to treat the eight remaindermen collectively or individually. Note her Item Fifth (with our emphasis): "*All* the rest and residue of my estate, of every nature and whatsoever and wheresoever situate . . . [lapsed annuities] shall be added to the corpus or principle of the estate, for the benefit of *my residuary legatees* . . . the property then composing the trust estate, together with the then unexpended or undivided income therefrom, shall be distributed equally, share and share alike, *among,* and paid to, the said [residuary legatees] and their respective descendants." At three places in testatrix' will she referred to the eight remaindermen as "my residuary legatees." Division of the corpus was to be made *among* them. From all this we conclude the testatrix left the residuary trust to the eight remaindermen collectively, not individually.

This conclusion of a collective gift is buttressed by the case of *McElroy v. Fluker,* 265 S.W.2d 361[4] (Mo.1954). There the testator left his daughter Gladys $1,000 but bequeathed his residuary estate to his sisters Jenny and Florence "share and share alike," thereby omitting daughter Gladys from the residue. Sister Jenny predeceased the testator and daughter Gladys contended her father had died intestate as to Jenny's one-half the residuary estate. In refuting this and holding surviving sister Florence was entitled to the full residuary estate the court said: "Defendant Gladys was given $1,000 by Item 3, and no further mention was made of her. If testator had intended that she, in any event, was to further share in his estate he no doubt would have said so. To impute to the testator the intention to die intestate as to half of the residuum would be to augment, by distribution to her of half of the residuum, the $1,000 (only)

bequest to the daughter. The will nowhere indicates such an intention. And so it would seem that he considered Item 13 as complete, in any event, in disposing of 'the balance of all personal property.'"

■ There is still another reason to refute Norman Webber's and Lucy Brown's efforts to share in the residuary trust estate as testatrix' intestate heirs. Their contention conflicts with another expression of the testatrix' intent. She had given her son William substantial gifts of real and personal property, but note this provision in her will: "I will make no other provisions for my said son in and by this will for the reason that he has already been amply provided for in and by his father's will."

Norman Webber's and Lucy Brown's claimed rights as intestate heirs of Eliza McMillan arise as legatees of her son William McMillan, whom testatrix specifically excluded from the residuary trust. Norman and Lucy's rights are no greater than William's would be were he still alive. To test this hypothesis let us assume William McMillan were alive today contending the lapsed residuary shares of William Kingston and Norah Lawrence had passed to him by intestate succession as his mother's sole heir. The testatrix' intent being a prime factor in construing her will, William McMillan's claim would be demolished by the provision of her will declaring that beyond the specific testamentary gifts she had made to him he was not to participate in her estate. That clear intent would bar his contention that the testamentary shares of William Kingston and Norah Lawrence were intended by the testatrix to pass to him by intestate succession. The present more remote successors have no rights higher than William McMillan would have had. So, Eliza McMillan's intent that her son not participate further in her estate precludes those now claiming under him.

■ The "McMillan group" also challenges the distributive share of the corpus awarded plaintiff Jean Cavers, contending her share of the legacy has lapsed. They refer to the residuary clause of the will bequeathing the corpus to "Jennie Cavers or her said daughters," contending since Jean Cavers was not Jenny Cavers' daughter but only a stepdaughter, that share lapsed and passed to them as the testatrix' intestate heirs. This argument falls, for two reasons: First, we note that the will elsewhere referred to Jean Cavers as Jennie Cavers' stepdaughter. The words "daughters" and "stepdaughters" are surplusage. We fully concur in the trial court's interpretation of the will negating any lapse of Jenny Cavers' share: "Testatrix intended to give Lynn and Jean Cavers the same interest they would have had if they were Jennie Cavers' natural daughters."

Second, even were that not so, it would avail the "McMillan group" nothing since they claim as Eliza's intestate heirs through her son William. As ruled *supra* testatrix' exclusion of her son William from her residuary estate precludes the McMillan group from succession through him.

As ruled by the trial court, we hold the residuary trust corpus should now be distributed to the five successors of the eight original remaindermen. The judgment below is affirmed.

The trial court properly reserved jurisdiction of the cause to make allowances for and ordering payments to attorneys and guardians at litem as fees and costs, and to thereafter order the trustee to pay the corpus to the distributees. For that purpose the cause is remanded.

Judgment affirmed and cause remanded.

KELLY and STEWART, JJ., concur.